UNITED STATES *v.* GEO. S. BUSH & CO. INC. (No. 3114)[1]

United States Court of Customs Appeals, January 29, 1929

*Charles D. Lawrence*, Assistant Attorney General (*John F. Kavanagh*, special attorney, of counsel), for the United States.
*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellee.

[Oral argument December 12, 1928, by Mr. Lawrence and Mr. Baldwin]

Before GRAHAM, Presiding Judge, and BLAND and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Paragraph 31 of the Tariff Act of 1922 reads as follows:

PAR. 31. Compounds of pyroxylin, of other cellulose esters or ethers, or of cellulose, by whatever name known (except compounds of cellulose known as vulcanized or hard fiber), in blocks, sheets, rods, tubes, or other forms, and not made into finished or partly finished articles, 40 cents per pound; made into finished or partly finished articles, of which any of the foregoing is the component material of chief value, 60 per centum ad valorem: *Provided,* That all such articles (except photographic and moving-picture films), whether or not more specifically provided for elsewhere, shall be dutiable under this paragraph.

Appellee imported at Portland, Oreg., articles of pyroxylin invoiced as "Hecolith-Base-Plates-Upper jaw" and "Hecolith-Base-Plates-Lower jaw," which were assessed for duty as articles finished or partly finished, made from compounds of pyroxylin, at 60 per centum ad valorem under paragraph 31, *supra.* The importer protested the classification and claimed among other things that the merchandise was properly dutiable at 40 cents per pound under the same paragraph. The protest also was against the assessment of 10 per centum additional duty which was assessed on account of the failure to mark the im-

---

[1] T. D. 43222.

portation with the country of origin as required by section 304 (a) of the Tariff Act of 1922. The United States Customs Court sustained that part of the protest claiming the merchandise dutiable as pyroxylin forms at 40 cents per pound, but overruled the latter part of the protest which had reference to the marking of the articles.

The articles as imported are intended to be used in the manufacture of dental plates which hold artificial teeth. The samples of the importation vary somewhat in size and shape, depending upon whether they are used in making plates for the upper or lower jaw. These shapes are more or less appropriate for the particular type of plate into which they are to be made and for this reason the Government claims that they are partly finished articles, while the importer contends that they are pyroxylin forms. The articles are somewhat U-shaped, or horseshoe-shaped, following the curvature of the gums in the human mouth. The sides of the plates into which the teeth are to be pressed are concave and the other sides are more or less convex or raised. The material of which the articles are composed is of German origin, is called Hecolite, and is handled in this country by the American Hecolite Denture Corporation.

The articles are used in this country in the following manner: Plaster-of-Paris molds of the mouth and gums of the patient are first made. In the mold is placed one of the imported blanks together with the required number of artificial teeth. After the blank is softened in water, the whole is pressed together under high temperature so as to make the teeth and gums all fit into the mold and thus form an artificial plate. After it is pressed into the mold, the Hecolite has none of the form in which it was imported except the round, horseshoe-curved effect. The pressure spreads the Hecolite to such an extent that large portions of the same squeeze out through the mold and must be trimmed off in order to make the finished plate. The Hecolite blanks, as well as the rectangular, flat piece of the same material, offered as exhibits in the case, have a pinkish color similar to the natural color of healthy gums. The evidence shows that there is a great saving of material and labor in the making of dental plates out of these U-shaped blanks since there is less waste from cutting away the unnecessary portions squeezed out of the mold, and that the use of these shapes is more convenient than is the use of the same material in the form of blocks or sheets. One witness stated that the blanks vary in size and that this fact makes it easier to select the right size and that their use for that reason is more economical.

The value of the imported blank (about $1.50 retail) is relatively small when compared with the completed plates, which would sell for some $10 to $15, and the price of $10 or $15 would include the cost of labor in making the plate, and of the teeth, which would be

about $2.60 per set. The flat, square sheet, Exhibit B, introduced in evidence, is shown to come from the same kettle as Exhibit 1, which is one of the imported blanks, the one being poured out into a flat mold and the other being poured into a mold in substantially the form of the gums of the human mouth. The record discloses no other use for the material than that above indicated.

The importer contends that the importation is described in paragraph 31, *supra,* as "other forms, not made into finished or partly finished articles," and that the imported articles are "forms" in the same sense as blocks, sheets, rods, and tubes.

The Government argues that they have passed the "form" stage, within the meaning of the paragraph, and are partly finished articles in so far as they, in their construction, have been partly finished, in shape and size at least, into dental plates, and that from the raw material they have been so processed and advanced as to dedicate them to a single, new use, with a new name, "Hecolith-Base-Plate." The Government does not contend that they are finished articles but that they are, under well-settled law, made or manufactured into partly finished articles.

We agree with the Government's contention. The importer, in order to have these articles classified as forms under the paragraph, would give the word "form" the same meaning as would be attached to blocks, sheets, tubes, and rods. The definition of the word "form" when used in this sense is found in Webster's New International Dictionary as follows: "The shape and structure of anything as distinguished from the material of which it is composed." In another sense it must be conceded that the importation is a form when the word "form" is used in the sense of a *figure* or a *blank.* The importation is nothing more than a blank form which later is finished into a plate. One of the definitions of "blank" in the same dictionary is: "Showing a solid, plain, or unbroken surface where an opening, interruption of continuity, or the like, is usual, esp. as a result of being unfinished; hence, not shaped to the final or finished form; as a *blank* key, * * * a *blank* bolt;". But the latter is not the kind of form to which that portion of paragraph 31 relates.

The case of *United States* v. *Embossing Co.,* 3 Ct. Cust. Appls. 220, T. D. 32536, is the only authority relied upon by the importer. We think that case is not in point. The decision in that case involved the classification of a kind of modeling material known as "plasticine." It was classified as an article in chief value of earthy or mineral substances. The court held that it was in the nature of material and while, in a broad sense, it was an article, the paragraph did not intend to include earthy or mineral substances in the mass as an article, and, since the importation was not designed to receive a

definite and specific form or shape for ultimate use, it should not have been classified as an article. The difference between that case and the one at bar is that the material herein involved has received a shape for ultimate use, and to that extent the articles are partly finished.

A number of cases are cited by the Government, most of which are concerned with the determination of when a thing is a partly finished article or a partly manufactured article. In *United States* v. *Foscato*, 6 Ct. Cust. Appls. 15, T. D. 35251, cited by the Government, the question was whether slabs of colored or gilded glass were articles. The court said:

The goods in question have been so far advanced beyond the condition of a mere raw material that they have not only received a distinctive name, but a special definite form, which commits them to a specific ultimate use and apparently renders them commercially unfit for anything else.

*United States* v. *Richter*, 2 Ct. Cust. Appls. 167, T. D. 31680, *Saltonstall* v. *Wiebusch*, 156 U. S. 601, and *Tide Water Oil Co.* v. *United States*, 171 U. S. 210, were also cited upon the question of the difference between raw material and the manufactured article. While these cases are not exactly in point they may have some bearing on the issue.

The language used by Congress in paragraph 31 is very simple and admits of little room for construction. It does not seem difficult to ascertain the meaning of the words "partly finished articles." It is conceded in this case that the horseshoe effect or shape of the articles is given in an effort to fit them for the definite use of making plates of this general shape. To that extent we think they are partly finished articles.

No doubt the theory of the framers of the paragraph was that a higher rate of duty should be placed upon an article upon which work had been done toward bringing it to the finished state than upon raw materials which were in blocks, sheets, rods, and tubes, and not dedicated to the making of any particular article. In this view of the case we think the higher duty should maintain, and we so hold.

The court below sustained the protest in so far as it claimed a dutiable status of 40 cents per pound, but overruled the protest in all other respects which included the protest against the assessment of the 10 per centum additional duty.

The court below properly overruled the protest against the assessment of additional duty. The plates, as imported, were marked at the time of manufacture "Hekolith Platte" with the addition of certain other letters and numbers. There are but few articles that have been presented to this court which would seem to be more

susceptible of marking at the time of manufacture than this plastic material. This question is not discussed in either brief, but we conclude from the record that it was the position of the importer before the court below that, since the subsequent operation of making the plates would destroy the marking and the ultimate consumer or user of the plates would not be enabled to see it, they were not such articles as were required to be marked. The consumer of this importation, in one sense, is the dentist, and we know of no reason why it should not have been marked under the provisions of the statute.

That portion of the judgment of the United States Customs Court which sustained the protest of appellee is *reversed*, and that portion of the judgment which overruled the protest is *affirmed*.