UNITED STATES *v.* AMERICAN HECOLITE DENTURE CORP. (No. 3629) [1]

---

[1] T. D. 46465.

United States Court of Customs and Patent Appeals, May 22, 1933

*Charles D. Lawrence,* Assistant Attorney General (*Hugo P. Geisler* and *Ralph Folks,* special attorneys, of counsel), for the United States.
*Lawrence & Baldwin* (*Martin T. Baldwin* of counsel) for appellee.

[Oral argument April 6, 1933, by Mr. Folks and Mr. Baldwin]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

Certain merchandise described by the collector at the port of Portland, Oreg., as "hecolith base plates, U-shaped," was imported by the appellee under the Tariff Act of 1922 and was classified by the collector under paragraph 31 of said act at 60 per centum ad valorem, as compounds of pyroxylin made into finished or partly finished articles. The importer protested, claiming the goods to be dutiable at 40 cents per pound under said paragraph as compounds of pyroxylin in blocks, sheets, rods, tubes, or other forms, not made into finished or partly finished articles. A further claim was made under paragraph 1459, but this claim has not been pressed and will not be here considered.

The United States Customs Court sustained the protest and held the goods to be dutiable as claimed by the importer, and from that judgment the Government has appealed.

Said paragraph 31 is as follows:

PAR. 31. Compounds of pyroxylin, of other cellulose esters or ethers, or of cellulose, by whatever name known (except compounds of cellulose known as vulcanized or hard fiber), in blocks, sheets, rods, tubes, or other forms, and not made into finished or partly finished articles, 40 cents per pound; made into finished or partly finished articles, of which any of the foregoing is the component material of chief value, 60 per centum ad valorem: *Provided,* That all such articles (except photographic and moving-picture films), whether or not more specifically provided for elsewhere, shall be dutiable under this paragraph.

The goods imported are identical with those before this court in *United States v. Bush & Co.,* 16 Ct. Cust. Appls. 478, T. D. 43222. A full description of the articles, and of their use in making artificial dentures, is found in the case referred to. It will be sufficient, for the purposes of this opinion, to say that the imported articles are made of a pyroxylin preparation known as hecolith, and are U-shaped. One of the official samples is somewhat semicircular in form and shaped for making a plate for an upper set of false teeth. The other class of

articles, as shown by the official sample, is also U-shaped in form, but with the center portion cut out, so that the article appears somewhat crescent-shaped, and is especially adapted for use in making a base for a lower set of false teeth. They are polished, have the name and origin of the goods stamped thereon, and are colored to imitate the color of human gums. The evidence shows that they are used as a base upon which to mount false teeth, and in which the teeth are mounted by the process described in *United States* v. *Bush & Co., supra.* The imported articles were of various sizes, the various sizes being so made that the dentist may the more readily obtain a size which will fit the mouth of the patient for whom he is making the denture.

The record discloses that before importation these articles are made by the use of hecolith, which is usually first made in blocks or sheets. A portion of this material is placed in a mold and is compressed under heat until it assumes the form of the imported article. This compression and heat, according to the importer, increases "the chemical and physical combination of the material."

After they are imported, these articles are subjected to what is known as a "chemical oxygenation process." This process consists of placing them in a large ventilated chamber, in which they are sealed, and where they are subjected to the action of alkaline gases, such as chloride of lime. This process reacts on the camphor content by producing ozone, and shrinks the articles, to some extent, and is said to stabilize them from shrinkage and warpage. The testimony shows that this process has to be followed before they are fit for use as dentures.

After the articles are thus processed, they are sold by the importer to various persons, the chief use being by dentists to make plates for artificial teeth. There was evidence offered by the importer to the effect that he has also sold some of this material for use in making artificial eye bases and surgical pessaries. The importer also uses a part of said imported material for making pyroxylin paste and liquid solution which he sells to dentists for the purpose of repairs. The record shows very fully that the chief use of the material is for making plates for artificial teeth, and that the other uses are minor.

The testimony also shows that, in addition to using the articles as imported for complete sets of teeth, these articles are sometimes sawed into pieces, by dentists, for the purpose of making partial dentures or bases for one or more teeth which are to be used as partial plates. In such cases, the small piece is placed in a mold and the tooth or teeth mounted in the same manner as would be followed if a full set of teeth were being manufactured.

The importer introduced samples of finished plates with teeth mounted therein. In the case of full plates, these exhibits showed that the general form of the imported articles had been preserved,

but they had been shaped into a form which would fit the particular mouth for which the denture was being made.

It was shown by the record that these plates for false teeth might also be made from hecolith imported in sheets, or tubes, or blocks, but that the articles imported were a more convenient form and saved waste of material.

The case seems to be controlled by our judgment in *United States* v. *Bush & Co., supra.* Here, as in that case, the importer is contending that these importations are merely "forms" of hecolith, and have not become "articles," either finished or partly finished. We are unable to agree with this conclusion. We expressed this view in the *Bush* case, which we still hold:

> The language used by Congress in paragraph 31 is very simple and admits of little room for construction. It does not seem difficult to ascertain the meaning of the words "partly finished articles." It is conceded in this case that the horseshoe effect or shape of the articles is given in an effort to fit them for the definite use of making plates of this general shape. To that extent we think they are partly finished articles.

> No doubt the theory of the framers of the paragraph was that a higher rate of duty should be placed upon an article upon which work had been done toward bringing it to the finished state than upon raw materials which were in blocks, sheets, rods, and tubes, and not dedicated to the making of any particular article. In this view of the case we think the higher duty should maintain, and we so hold.

The trial court held the view that the additional uses of the material shown by this record made necessary a different conclusion than that reached in *United States* v. *Bush & Co., supra;* that the imported articles were not shown to be dedicated to any one specific use; that, therefore, they could not be said to be articles, finished or partly finished, but were, rather, material only, and, as such, were dutiable as forms. In support of this position, *Bache* v. *United States*, 11 Ct. Cust. Appls. 314, T. D. 39129, and other similar cases were relied upon as laying down the rule that the imported goods could not be classified as "articles," unless they had been "exclusively appropriated to a given use as manufactured articles."

The single-use rule which the trial court invokes is a rule which has been applied only to cases where the competing provisions of the law are material for manufactures on the one hand and manufactures of some material on the other. The rule has not been applied to competing provisions such as those here involved, wherein compounds of pyroxylin in blocks, sheets, rods, tubes, or other forms, on the one hand, and compounds of pyroxylin made into finished or partly finished articles, on the other hand, are involved. Examples of such cases, and which are thought to be inapplicable here, are *Kotakudo Co.* v. *United States*, 17 C. C. P. A. (Customs) 355, T. D. 43798; *Quong Lee & Co.* v. *United States*, 20 C. C. P. A. (Customs) 192, T. D. 45981;

*Ringk & Co.* v. *United States*, 16 Ct. Cust. Appls. 132, T. D. 42769; *United States* v. *Cartier*, 20 C. C. P. A. (Customs) 215, T. D. 45994.

Here, the only question is whether these goods have been advanced beyond the stage of blocks, sheets, rods, tubes, or other forms of hecolith into articles, finished or unfinished. It must be quite obvious that they have; otherwise, there seems to be no reason for taking portions of the raw material, produced in blocks, as the evidence shows, softening the same, and compressing it under heat into the shapes now before us. It requires no argument to convince the mind that if the importer desires to use these goods for the manufacture of paste, liquid, pessaries, or artificial eye bases, where the product must be first melted, the original block form would fully supply the needs, and would, ordinarily, be used, because it is cheaper.

The imported goods were properly classified by the collector, and the judgment of the United States Customs Court should be and is *reversed*.