D. C. Andrews & Co. *v.* United States (No. 4100)[1]

United States Court of Customs and Patent Appeals, March 28, 1938

*Pickrell & McDonald* for appellant.

*Joseph R. Jackson*, Assistant Attorney General (*Daniel G. McGrath*, special attorney, and *Frank X. O'Donnell, Jr.*, junior attorney, of counsel), for the United States.

[Oral argument February 10, 1938, by Mr. Pickrell and Mr. McGrath]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD and LENROOT, Associate Judges [2]

BLAND, Judge, delivered the opinion of the court:

The importer imported at the port of New York a certain nickel catalyst, more particularly hereinafter described, which the Collector of Customs classified as dutiable under paragraph 397, Tariff Act of 1930, as an article composed in chief value of nickel, and assessed duty upon the same at the rate of 45 per centum ad valorem under the second part of the paragraph, since it was not plated with platinum, gold or silver, or colored with gold lacquer.

The importer protested the said classification and assessment of duty and claimed the catalyst to be dutiable as a combination or mixture of chemical elements, chemical salts or chemical compounds at 25 per centum ad valorem under paragraph 5 of said act, or as a combination of animal, vegetable, or mineral oils at 25 per centum ad valorem under paragraph 57 of said act, or as nickel and alloys, in which nickel is the component material of chief value in the form of grains, under paragraph 389, at 3 cents per pound. An additional claim was made under the nonenumerated paragraph, 1558, of said tariff act as a manufactured article at 20 per centum ad valorem. The claims under paragraphs 57 and 1558 are not urged here.

The United States Customs Court overruled appellant's protests and held that the merchandise was not an alloy of nickel; that it was properly classified and assessed with duty as an article composed in chief value of nickel, holding further that if the same was provided for in said paragraph 5, it was more specifically provided for in said paragraph 397.

From the judgment of the United States Customs Court, appellant has appealed here.

In view of our conclusion, it is necessary here to quote only the following pertinent provisions of the statute:

PAR. 397. Articles or wares not specially provided for, if composed wholly or in chief value of platinum, gold, or silver, and articles or wares plated with

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, 65 per centum ad valorem; if composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, 45 per centum ad valorem.

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

PAR. 389. Nickel, and alloys (except those provided for in paragraph 302 or 380) in which nickel is the component material of chief value, in pigs or ingots, shot, cubes, grains, cathodes, or similar forms, 3 cents per pound   *   *   *.

The merchandise is commonly known as a catalyst and is invoiced as a "Catalysator" or as a "Catalyst." Testimony was adduced by appellant concerning the character, use, and mode of manufacture thereof. This testimony was given by two highly qualified chemical engineers. One of them, Arne R. Gutheim, stated that it was imported in steel drums and contained the following ingredients:

> 1.08 per centum of nickel sulphide
> 4.58 per centum of nickel oxide
> 20.3 per centum of metallic nickel
> 47.75 per centum of palm oil
> 26.29 per centum of kieselguhr

The other witness, Truman M. Godfrey, stated that the catalyst was used by Lever Brothers Co., the ultimate consignee herein, in a process of hydrogenation of vegetable oils, such as cottonseed or peanut oil, in making a vegetable lard substitute similar to Crisco and other commercial shortening products. He stated that the process of manufacturing which he had observed abroad as well as in this country was a chemical one and that the nickel particles that went into the catalyst were similar in size to the particles of gunpowder used in the manufacture of Chinese firecrackers. It is shown in evidence that in the manufacture of the catalyst it is customary to start with a chemical compound, nickel sulphate, a green crystalline substance, which is put in a solution in water of about 50 per centum by weight, to which is added kieselguhr equal to the weight of the nickel in the nickel sulphate; that kieselguhr is infusorial earth, the purpose of which is to "furnish a large surface over which the material to be made is distributed." The mixture is boiled and the nickel sulphate converted to nickel carbonate by the addition of sodium carbonate. The nickel is precipitated on the kieselguhr as nickel carbonate. After describing the process above, the witness Godfrey then said:

A. (Continuing) The precipitate or solid matter then existing in the solution is kieselguhr which is covered with nickel carbonate. This solid material is filtered off from the liquid by means of a filter press. The contents of the filter press are then washed with water and dried with steam in order to partially dry the cake.

After the cake is removed from the press, it is dried further by spreading on the floor or in some simple manner and it is crushed so that it appears as this sample of green catalyst. It is called green catalyst because it is green in color, and also because it has not been roasted yet.

    \*        \*        \*        \*        \*        \*        \*

A. (Continuing) The green catalyst is then fed into a furnace at counter current with a stream of hydrogen. The temperature of the furnace ranged from 350 to approximately 500 degrees centigrade. This exposure to heat causes the green catalyst to, first, be reduced to nickel oxide. Remember, it was nickel carbonate on kieselguhr. Now, it is reduced, first, to nickel oxide—I should not say "reduced"; "changed" to nickel oxide, first—and then the nickel oxide is reduced by the hydrogen gas to nickel catalyst. Now, the nickel catalyst, when it comes out of the furnace looks like black powder, a granular material.

In describing the use of the catalyst in this country the witness said:

The purpose of the catalyst is to enable Lever Brothers Company to manufacture a hydrogenated shortening of lard-like or plastic consistency from liquid vegetable oil. This is accomplished by mixing about one pound of catalytic nickel with a thousand pounds, or with each thousand pounds, of refined and bleached cottonseed oil or peanut oil.

Then the witness stated that:

The hot mixture of fat and catalyst is then pumped through a filter press which removes the catalyst. This is a filter press cake.

and that the catalyst could be used for no other purpose than the hydrogenation of oils. It is stated by appellant's counsel in argument that the length of time a catalyst could be used for the purpose stated depended on the quantity of certain impurities in the material to be hydrogenated.

Appellant's main contention here is that the merchandise at bar is not an *article* or *ware* within the purview of paragraph 397, first, because it is a plastic mass without a specific or definite form or shape; second, that it is excluded from the provision under the doctrine of susceptibility, since the merchandise is not in such shape or form as to be susceptible of being plated with gold or silver or colored with gold lacquer. Appellant at great length argues that since the merchandise is composed of a mixture or a combination of nickel sulphide and nickel oxide, both of which are chemical compounds, and since metallic nickel is a chemical element, the admixture of these ingredients with palm oil, an organic substance, and kieselguhr, an inorganic substance, makes the merchandise aptly fall within the provision of paragraph 5 for "All chemical elements, all chemical salts and compounds  \*  \*  \* and all combinations and mixtures of any of the foregoing." Appellant at some length argues that the merchandise is aptly described in paragraph 389 as "Nickel, and alloys  \*  \*  \* in which nickel is the component material of chief value."

Appellant quotes a number of definitions from many authorities of the term "alloy." The definition in Webster's New International Dictionary (1933) is quoted as follows:

2. A substance composed of two or more metals intimately united, usually by fusing the components together; also, the state of. union of the components; as, brass is an alloy of copper and zinc. By extension, a similar substance formed by the union of a metal and a non-metal; as steel is an alloy of iron and carbon.

The following definitions, *inter alia*, are also given by appellant:

"The Metals, Their Alloys, Amalgams and Compounds," by A. Frederick Collins (1932):

Now an alloy in its simplest sense is produced when two or more metals are melted and mixed together as, for example, in the combination of copper and tin, the alloy of which we call bronze. An alloy also results when one or more of the non-metals are mixed with a melted metal or metals, for instance, carbon with melted iron.

"Chemical Dictionary," by I. W. D. Hackh (1929):

Alloy. A mixture of two or more metallic elements (or non-metals, as C., Te, P) which has a metallic appearance and which is either * * *.

The Government cites some of the foregoing definitions of the term "alloy" and also the following:

"Alloys and Their Industrial Applications" by E. F. Law, 4th Edition (1919), pages 1 and 2:

There has been some difference of opinion as to the origin of the word alloy, but according to Roberts-Austen it is derived from the Latin word *alligo (ad ligo)*, "to bind to," and refers to the union or binding together of the metals constituting the alloy. * * * "a mixture of two or more metallic substances which, after melting, does not separate into two distinct layers." * * * "a coherent metallic mass produced by the intimate mixture, whether by fusion or otherwise, of two or more metals or metallic substances."

"Metals and their Alloys", Charles Vickers, pp. 129, 134, 135:

When all things are considered, it is evident that an alloy cannot be a mere mechanical mixture of several metals, and hence there remains only the possibility of its being either a chemical combination or simply a solution of one metal in another, * * *.

* * * * * * *

The word "alloys" suggests combinations of different metals such as copper, tin, lead, zinc, antimony, nickel, and others. * * * the term alloys is an all embracing one, and includes admixtures of metals which are not confined to a base of copper, exclusively, but may also have iron or any other metal as a base. * * *

While it must be conceded that a mixture of iron and carbon (carbon being a nonmetallic substance) forms steel, which is an alloy, the authorities examined disclose no other alloy which comprises only a single metal. No authority has been cited which supports the proposition that adding extract of fat and a clay substance to nickel forms a metal alloy. Nickel sulphide, nickel oxide, and metallic nickel made up the nickel component in the imported merchandise. It was all nickel. The palm oil and the kieselguhr (infusorial earth) did not intimately mix with the nickel as is required to form an alloy such as takes place in the mixture of carbon and iron to form steel. The material at bar has neither the characteristics nor the uses of a nickel alloy.

Concerning alloys of nickel, the Tariff Commission in its Tariff Information Surveys, 1921, prepared for the Committee on Ways and Means of the House of Representatives, in the volume entitled "Metals and Manufactures of Metals, Part 2," at page 10 of Survey C–23, says:

#### ALLOYS OF NICKEL

Nickel is capable of alloying with all the common metals and its alloys are characterized by homogeneity of individual composition and structure.

·Nickel steel is the most·important of nickel alloys. It contains about 3½ per cent nickel and has great strength and ductility as compared to carbon steel. Its use is so varied and important that it is to be considered in a separate survey.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Miscellaneous nonferrous alloys of nickel.—Nickel enters into the composition of a number of important alloys not included in the above heads. It is a valuable constituent in high electrical resistance alloys and in alloys adapted to resist chemical action from acids, etc. Many of these are marketed under special names and the list grows daily. The composition of many of these alloys is subject to wide individual variation, e. g., "Manganin" an important high resistance alloy has, on analysis, shown contents of nickel·varying from 41 per cent to 2.3 per cent; copper from 81 to 58 per cent, and manganese from 15 to 1 per cent. This is an extreme case of variation in composition, but serves to illustrate that the trade alloys are sold according to their properties rather than according to composition.

Important alloys of nickel and copper, with aluminum, chromium, manganese, and other metals have been developed. Nickel lead is more resistant to corrosion, but is not so strong as antimonial lead.

In Kingzett's Chemical Encyclopaedia (Fourth Edition) at page 481, under "NICKEL and its Compounds" is found the following:

\*　\*　\* It [referring to nickel] finds further use as a catalyst in connection with a number of processes, including hydrogenation. \*　\*　\*

Nickel salts, including the chloride, sulphate, and fluoride, are used in nickel-plating, the last named giving a finer-grained deposit with high tensile strength and greater hardness.

For use as a catalyst the metal is prepared by heating the hydrated oxide, carbonate, formate, or oxalate at from 250° to 300° C. in the absence of air, although when obtained by reduction it is liable to contain some unstable hydrides.

When used in connection with the hydrogenation of oils, it can be regenerated by removing the oil with a solvent, then treating the catalyst with some agent capable of dissolving the film of oxide ȯn the metal, washing, and sealing it against access of air.

To our mind this information tends to show that the merchandise at bar is nickel which has been so manufactured as to be suitable for catalytic use only and is not an alloy within the meaning of paragraph 389.

As giving added information on the character, importance, and use of nickel alloys, we quote the following under the head of "Non-ferrous Alloys" from the article on "Alloys" in volume 1 of the Encyclopaedia Britannica at page 663:

\*　\*　\* Among other important nickel alloys are those used as high temperature heating units in electric furnaces, thermo-couples, etc., known as nichrome,

chromel, alumel, etc. These alloys all contain from 60 to 94% nickel, the other alloying elements being chromium, iron or manganese. Of particular industrial as well as scientific interest is an alloy containing 79% nickel and 21% iron, known as permaloy. This alloy when properly prepared has a low magnetic hysteresis and a very high magnetic permeability in weak fields. Its properties have made possible great advances in trans-oceanic communication by wire. * * *

In view of the foregoing, we hold that the merchandise is not described in paragraph 389 as nickel or as an alloy of which nickel is the component material of chief value.

Since the oral argument in the case, appellant has filed a supplemental brief in which it is argued that the record shows that the palm oil component in the catalyst, under the decision of this court in *Aetna Explosives Co.* v. *United States*, 9 Ct. Cust. Appls. 298, T. D. 38238, affirmed in *United States* v. *Aetna Explosives Co.*, 256 U. S. 402, must be considered as a mere packing of the catalyst metal and is added to prevent oxidization by the atmosphere.

As we understand the contentions of appellant's learned counsel, they are that the merchandise is a nickel alloy and not nickel. Obviously, the importation is more than nickel, and it is not seen how a conclusion that the palm oil should be regarded as a packing could require a holding by this court that the catalyst at bar is a nickel alloy.

We will next pass upon the question as to whether or not the imported catalyst is an article or ware composed in chief value of nickel, and not plated, within the meaning of paragraph 397.

Appellant in urging that the catalyst is not an "article" or "ware" relies upon a number of decisions, all of which need not be discussed here. *United States* v. *Embossing Co. et al.*, 3 Ct. Cust. Appls. 220, T. D. 32536; *Bartley Bros. & Hall et al.* v. *United States*, 3 Ct. Cust. Appls. 363, T. D. 32961; and *United States* v. *Geo. S. Bush & Co., Inc.*, 16 Ct. Cust. Appls. 478, T. D. 43222, seem to be as near in point as any of the cases relied upon and will be briefly referred to.

In the *Embossing Co.* case, *supra*, the question arose as to the tariff classification under the tariff act of 1909 of a modeling material "plasticine" which the importer claimed to be made up of water, vaseline, chalk, flour, tallow, and sulphur, mixed together by a secret process. It was classified under paragraph 95 as an article composed wholly or in chief value of mineral substances. This court held that it was not an article or ware under that paragraph and in so holding said:

In fact, considering that "article," in its largest sense, may be applied to almost every separate substance or material, and that the mineral kingdom divides honors with the animal and vegetable kingdoms, the phrase "all articles composed of * * * mineral substances" would, in its widest acceptation, embrace about everything which was not animal or vegetable matter.

Manifestly, the reversal or affirmance of the decision of the board depends upon whether the paragraph shall receive the broadest construction which its language permits, or a restricted meaning which will either exclude the mineral

substances of which the modeling material is made or limit "articles and wares" to such things as have received a specific, definite form for ultimate use. In the Dinglestedt case, just referred to [*Dinglestedt* v. *United States*, 91 Fed. 112], it was held that the phrase "all articles composed of * * * mineral substances" was not used in its broadest sense in paragraph 86 of the tariff act of 1894, and that it was limited to articles composed of mineral substances similar to those enumerated in Schedule B, if not to those mentioned in the subdivision of which the paragraph formed a part. Whether the interpretation there adopted still holds good notwithstanding the modifications to which both schedule and subdivision have been subjected we deem it unnecessary to decide, in view of the fact that we think the case may be disposed of on a judicial interpretation of the meaning of "articles and wares," which seems not to have been modified but tacitly approved by subsequent legislation.

The *Bartley Bros. & Hall* case, *supra*, involved an impalpable powder called "Goodard's Plate Powder," used for polishing plate, which powder had been assessed for duty under paragraph 95, tariff act of 1909. The court followed its decision in the *Embossing Co.* case, *supra*, and adhered to the views there expressed that the term "articles and wares" as used in the earthy or mineral substances paragraph should not be given its broadest meaning so as to include the powdered material.

In both of these cases, the context of paragraph 95 of the tariff act of 1909 and of predecessor and related paragraphs was relied upon to show that Congress did not intend the term "articles and wares" in paragraph 95 of said act to include such merchandise as was then under consideration.

In the *Bush & Co.* case, *supra*, the court held, for reasons which do not apply to the facts at bar, that blanks of "hecolite" used in making artificial teeth were, under the peculiar circumstances of that case, to be regarded as *partly finished articles* within the meaning of the particular term there under consideration. We there discussed the *Embossing Co.* case, *supra*, and held that it was not in point.

It will be noticed that in the *Embossing Co.* case, *supra*, the court pointed out that the term "articles" might be used in its broadest sense to describe almost every separate substance or material. The court then used the following pertinent language which we requote:

Manifestly, the reversal or affirmance of the decision of the board depends upon whether the paragraph shall receive the broadest construction which its language permits, or a restricted meaning which will either exclude the mineral substances of which the modeling material is made or limit "articles and wares" to such things as have received a specific, definite form for ultimate use. * * *

Appellant argues, as before stated, that the material at bar has not received a specific, definite form for ultimate use. The merchandise in the instant case differs greatly from that in the *Embossing Co.* case, *supra*. The paragraph involved here and the one involved there have little in common as affecting the question at bar, but even if we were to apply the doctrine here that in order for a substance to

come within paragraph 397 it would be necessary for it to be manufactured into such "specific definite form" as to fit it for its ultimate use, we are of the opinion that the instant merchandise has been so processed. The metal particles are used in the exact form and shape in which they are imported. They have been especially processed to be suitable in the form imported to bring about the catalytic action required.

It is unnecessary for us here to discuss at great length the various shades of meaning which might be attached to the words "articles" and "wares" as used in the different provisions of the Tariff Act of 1930 and in practically every tariff law enacted in the United States. It is obvious that the term "article" is broad enough in the nonenumerated paragraph to include any nonenumerated substance. Possibly, in other paragraphs the term "article" necessarily would be given a narrower meaning depending upon the context, scope, and purpose of the whole provision. The instant merchandise is in chief value of nickel. Nickel is one of the well-known and valuable base metals. The same paragraph contains reference to the precious metals as well as base metals, other than nickel. In other words, it is a paragraph covering metal articles or wares placed in the tariff schedule of "Metals and Manufactures of" metals, and we see no reason why the material at bar, being essentially a nickel article, should not find classification therein unless it is excluded by virtue of the so-called doctrine of susceptibility which we next propose to discuss.

On the contention that Congress did not intend metallic articles to find classification in paragraph 397 if they were not susceptible of being plated with a precious metal or gold-lacquered, appellant relies heavily upon the case of United States v. Downing, 201 U. S. 354, and other cases involving, in a general way, the same question. In the Downing case, the Supreme Court of the United States was reviewing a decision of the Circuit Court of Appeals for the Second Circuit which had held that sticks of carbon for electric lighting were dutiable under paragraph 97 of the tariff act of 1897 as articles and wares composed in chief value of earthy or mineral substances. The Supreme Court held, citing Dingelstedt v. United States, 91 Fed. 112, that the earthy or mineral substances paragraph was not intended to cover articles or wares which were not susceptible of decoration.

In Fensterer & Ruhe v. United States, 1 Ct. Cust. Appls. 93, T. D. 31110, this court had under consideration paragraph 96 of the tariff act of 1897 which provided for "All  *  *  *  bisque, earthen, stone, and crockery ware  *  *  *  if painted, tinted  *  *  *  or otherwise decorated [etc.]." After reviewing the various decisions, including the Dingelstedt case, supra, the court stated, in substance, that in view of the Supreme Court's construction in the Downing case, supra, of paragraph 97 of the same act, it felt impelled to adopt the

view that because the articles under consideration were bisque and not susceptible of decoration, they could not be classified under paragraph 96. Paragraph 97, construed in the *Downing* case was quite similar to paragraph 96 involved in the *Fensterer* case in respects with which we are here concerned. Paragraph 97 provided "if not decorated in any manner, thirty-five per centum ad valorem; if decorated, forty-five per centum ad valorem" which term modified the provision for articles and wares composed wholly or in chief value of earthy or mineral substances.

In *Pasquale Russo, Strohmeyer & Arpe Co.* v. *United States*, 22 C. C. P. A. (Customs) 125, T. D. 47106, this court had occasion to refer to the doctrine of susceptibility in determining the dutiable classification of imported strings of dried peppers under a provision reading "* * * pepper, capsicum or red pepper or cayenne pepper, unground, 5 cents per pound; ground, 8 cents per pound * * *." It was there contended that since the peppers were never ground but were sometimes cut or crushed, they did not fall within the paragraph under the so-called doctrine of susceptibility. We there said:

> While appellants have not pressed the doctrine of susceptibility, such as was emphasized in *United States* v. *Downing*, 201 U. S. 354, and *Fensterer & Ruhe* v. *United States*, 1 Ct. Cust. Appls. 93, T. D. 31110, they have urged the application of a somewhat similar doctrine in contending that a pepper which is not ground before use was not intended to be classified under paragraph 781. Appellants further urge that Congress has distinguished between "pepper," which they seem to urge is ground in its usable form, and "peppers," which are in the pod and not ground.
>
> The doctrine of susceptibility, although resorted to by this court in the *Fensterer & Ruhe* case, *supra*, and by other Federal courts with respect to particular merchandise when certain statutes were under consideration, has not been extended by this court, and has been given controlling influence only when the facts were identical or so nearly identical as to fall within the controlling influence of the *Downing* case, *supra*, and other similar cases referred to. See *United States* v. *Morimura Bros.*, 7 Ct. Cust. Appls. 285, T. D. 36801; and *United States* v. *Murphy & Co.*, 13 Ct. Cust. Appls. 456, T. D. 41348. Moreover, if the doctrine of susceptibility applies here, there is no showing that the peppers are not susceptible of being ground.

We refused to extend the doctrine in *United States* v. *Morimura Bros.*, 7 Ct. Cust. Appls. 285, T. D. 36801, in construing a paragraph which was held to include curtains in chief value of beads even though the paragraph provided "not embroidered or appliquéd," and it was obvious that the beaded curtains could not be embroidered or appliquéd. We there said:

> At the outset it may with propriety be observed that in the case of *Fensterer & Ruhe* v. *United States* this court somewhat reluctantly followed what it deemed to be the rule of construction applicable to the paragraph there under consideration, because of the interpretation which identical language in an earlier statute relating to the same subject matter had received in other Federal courts, but that rule has never been extended by this court.

To the same effect was our holding in *United States* v. *Murphy & Co.*, 13 Ct. Cust. Appls. 456, T. D. 41348, which involved snap fasteners not susceptible of being "mounted on tape." In the last-cited case there is a thorough discussion of the whole subject.

From an examination of the various cases which adhere to the doctrine of susceptibility, it appears that in each instance it was thought that Congress could not have used the particular language then at bar with any other intent than that the articles provided for in the controverted provisions would be susceptible of the treatment named in the paragraph. In other words, in each particular case, it was thought that the context of the provision sufficiently indicated the congressional intent.

It is our view in the instant case, as it was in some of the cases above cited, that the context of paragraph 397 does not permit of the application of the so-called doctrine of susceptibility in arriving at the congressional intent. It will be noticed that in the first part of the paragraph, provision is made for articles and wares "plated with platinum, gold, or silver, or colored with gold lacquer" and made dutiable at 65 per centum ad valorem, and that the second part of the provision applies a duty of 45 per centum ad valorem if not so plated or treated. We think that Congress was anxious to distinguish between articles and wares, which were composed of or plated with the valuable metals named, and articles and wares of base metal which had not been plated.

To our minds the paragraph at bar differs very materially from the controverted provisions in the cases relied upon by appellant in respect to the application of the so-called doctrine of susceptibility. In any event, what we said in the *Pasquale Russo, Strohmeyer & Arpe Co.* case, *supra*, which was based upon the *Morimura Bros.* and *Murphy & Co.* cases, *supra*, would seem to be particularly pertinent here. We have never extended the doctrine of the *Fensterer & Ruhe* case, which, as before stated, was based on the *Downing* case, *supra*, so as to apply it to circumstances and facts not identical with the facts in those cases or where they were not so nearly identical as to fall within the controlling influence of the decision in those cases. It would be an unwarranted extension of that doctrine to apply it to the facts at bar and, to our way of thinking, it would be extending it so as to result in defeating the purposes of Congress.

We do not believe that the framers of the catch-all metal paragraph, 397, here involved, contemplated a construction of the same which would deny classification therein of such a metallic article as is here involved. This conclusion is somewhat confirmed by a consideration of the fact that when the 1930 tariff act was being prepared, Congress had before it the Summary of Tariff Information, 1929, which, in Vol. 1 at page 908, in referring to articles that were

included in the predecessor paragraph 399, Tariff Act of 1922 (which was identical, except as to rates of duty, with paragraph 397 at bar), included the following pertinent language:

\* \* \* Others are products made from the various non-ferrous metals and alloys, such as aluminum, copper, brass, bronze, lead, nickel, zinc, pewter, tin, and *other metals, compositions, and manufactures not elsewhere provided for.* \* \* · \* [Italics ours.]

Further along in the article discussing the said predecessor paragraph, under the heading of "DECISIONS," attention was called to the fact that in Abstract (N) 3558, silver powder was held to be dutiable thereunder.

The briefs of the parties contain much discussion on the question as to whether or not the imported catalyst is described in paragraph 5. In view of our conclusion, it is not necessary for us to determine this question, since we conclude that if it is described thereunder, it is more specifically provided for in said paragraph 397. The two competing provisions, for the purpose of comparison, may be shortened to read: "articles or wares, if composed wholly or in chief value of nickel" as against "all chemical elements, all chemical salts and compounds \* \* \* and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially."

Counsel for appellant, while very earnestly contending in his brief that the record shows that the merchandise is a "mixture of a chemical element and chemical compounds" also says:

The merchandise at bar is the result of a chemical process and is used as material in the production of an edible shortening by a chemical process. It meets all the definitions and requirements of a chemical, and is properly classifiable in the chemical schedule of the Tariff Act of 1930, unless more specifically provided for elsewhere, as held by the lower court.

The term "All chemical elements, all chemical salts and compounds" is a very broad provision covering a multitude of articles. It is equally clear that "all combinations and mixtures" of chemical elements and chemical salts and compounds is an unusually broad provision. The paragraph includes a chemical element or a chemical compound. It also includes combinations (chemical and physical). It includes mixtures of chemicals as well as mixtures of compounds and also mixtures of chemical elements with the different kinds of compounds. Paragraph 397 is limited to articles or wares (and for our purposes it is not necessary to distinguish between the two terms). There are many kinds of metals which may be components of manufactured articles. The provision "articles composed wholly or in chief value of \* \* \* nickel" covers only articles of a particular kind of metal. Unquestionably, this provision is much more specific and definite as applied to the goods at bar than is paragraph 5 (assuming that paragraph 5 describes the importation). This was the hold-

ing of the trial court, which holding was based upon the decision of the Board of General Appraisers (now the United States Customs Court) in *F. Behrend* v. *United States*, T. D. 25733, 8 Treas. Dec. 526, and this court's decision in *Loewenthal & Co.* v. *United States*, 6 Ct. Cust. Appls. 209, T. D. 35464, the latter case containing a full discussion of the relative specificity between a provision "wholly or in part of" and one "wholly or in chief value of." The court said:

The predicating language in paragraph 358 is "wholly or in part of"; in 333 "wholly or in chief value of." Obviously, the latter is mathematically more specific than the former, for if *any part* of an article is as predicated it falls within the former, while it takes the *major part* thereof in value to so fall within the latter. In other words, the latter applies only when an article in content more than half in value falls therewithin, while the former is satisfied with much less, if any part falls therewithin. Therefore, the latter is the more narrow because the less easily satisfied.

Many authorities were therein cited. The same authorities are set out in the opinion of the trial court in the case at bar.

Applying the reasoning of the *Loewenthal & Co.* case, *supra*, to the facts at bar, it seems clear that "articles in chief value of nickel" is a much narrower provision and is restricted to a less number of articles than is "all combinations and mixtures of chemical elements." To fall within paragraph 397, the article at bar must be composed wholly or in chief value of nickel or one of the other metals named, while in the chemical element provision no more than a substantial quantity of any chemical component is required.

The remaining issue to be decided is the question presented by appellant's several assignments of error directed to the trial court's refusal to grant appellant's petition for a rehearing. The petition was based upon the fact that the trial court in its decision, in substance, held that the article was a completely manufactured article as imported and was ready for use and while so used preserved its identity and "remains intact throughout" and "never loses its identity when so employed." Appellant proposed to prove, if rehearing was granted, that 47.75 per centum by weight of the imported merchandise, the palm oil ingredient, is absorbed by the vegetable oil undergoing hydrogenation and that an equal quantity of vegetable oil replaces the palm oil and is ejected from the process with the spent catalyst, and that in the use of the merchandise the element nickel changes physically so that it no longer possesses its selective catalytic power and that after it loses its power it is returned to the manufacturer for remanufacture where it is again chemically treated in accordance with the process of manufacture described in the testimony of the witness Godfrey.

We think the court properly overruled the petition for rehearing. Certainly we cannot say that it abused its discretion in so doing. It is not seen how a consideration of these facts could possibly warrant the trial court in arriving at a conclusion different from that arrived at.

450

For the reasons hereinbefore assigned, it is our conclusion that the imported merchandise is dutiable at 45 per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as held by the United States Customs Court, and that no error was committed by the trial court in overruling appellant's petition for rehearing. The judgment appealed from is, therefore, *affirmed*.

DISSENTING OPINION

GARRETT, Presiding Judge: The proper classification of the merchandise here at issue presents a question which to me is somewhat difficult of solution, but I feel quite earnestly that it is not of the class provided for in paragraph 397. I think the "Articles or wares," for which that paragraph provides, contemplate things capable of being plated, and certainly that is not true of the merchandise before us.

I agree that it is not of a type classifiable under paragraph 389.

Upon the whole, it seems to me, basing the opinion upon its nature and the testimony concerning it, that it falls fairly within the terms of paragraph 5 as a chemical compound.

Appreciating the fact that dissenting opinions in cases of this type are of no practical value, I shall not enter upon a statement of reasons. They have been given to my associates in conference. In a general way, it may be said that, except as to the possible applicability of paragraph 389, I agree with the contentions of counsel for appellant.