(C.D. 2144)

NYLONGE CORPORATION *v.* UNITED STATES (AMERICAN SPONGE & CHAMOIS CO., INC., PARTY IN INTEREST)

United States Customs Court, First Division

(Decided December 28, 1959)

*Ulmer, Berne, Laronge, Glickman & Curtis* (*Sheldon J. Gitelman* of counsel) for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Mollie Strum* and *Richard H. Welsh,* trial attorneys), for the defendant.

*Sharretts, Paley & Carter* (*Howard Clare Carter* and *W. R. Johnson* of counsel) for the party in interest.

Before OLIVER, MOLLISON, and WILSON, Judges

OLIVER, Chief Judge: These protests were filed pursuant to the provisions of section 516(b), as amended, which grants to American

manufacturers, producers, or wholesalers the privilege of challenging by protest the classification of, and the rate of duty imposed upon, imported merchandise of a class or kind "manufactured, produced, or sold at wholesale by him." The merchandise in question was classified under the provision for compounds of cellulose, in blocks, sheets, or other forms, not made into finished or partly finished articles, in paragraph 31(b)(1) of the Tariff Act of 1930, as modified by T.D. 52739, supplemented by T.D. 52763, which, so far as pertinent, reads as follows:

| Tariff Act of 1930 paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 31(b) | All compounds of cellulose (except cellulose acetate, but including pyroxylin and other cellulose esters and ethers), and all compounds, combinations, or mixtures of which any such compound is the component material of chief value: | |
| (1) | In blocks, sheets, rods, tubes, powder, flakes, briquets, or other forms, whether or not colloided, not made into finished or partly finished articles: | |
| * | *        *        *        *        * <br> Other_____ | * <br> 20¢ per lb. |

Plaintiff, the Nylonge Corporation, concededly an American manufacturer or producer of merchandise of the same class or kind as the imported commodity involved herein, claims that the proper classification for this merchandise is as compounds of cellulose, made into finished or partly finished sponges, under paragraph 31(b)(2) of the Tariff Act of 1930, as modified by T.D. 54108, which, so far as pertinent, reads as follows:

| Tariff Act of 1930 paragraph | Description of Products | Rates of Duty | | |
|---|---|---|---|---|
| | | A | B | C |
| 31(b) | All compounds of cellulose (except cellulose acetate, but including pyroxylin and other cellulose esters and ethers), and all compounds, combinations, or mixtures of which any such compound is the component material of chief value: | | | |
| * <br> (2) | *        *        * <br> Made into finished or partly finished articles of which any of the materials provided for in paragraph 31(b)(1), Tariff Act of 1930, is the component material of chief value, not specially provided for * * *: | * | * | * |
| | Sponges_____ | | 40½% ad val. | |

Counsel for the party in interest has moved for dismissal of these protests on the ground that none of them "is appropriate to invoke the jurisdiction of the court." Two reasons are given for the motion to dismiss. One of them was presented at the pretrial conference when the party in interest moved to dismiss the protests because all of the entries covered thereby were liquidated on the same day and there was no showing which of them is "the first of such entries," following the decision of the Secretary of the Treasury rejecting plaintiff's complaint (93 Treas. Dec. 70, T.D. 54537). The basis for this contention is the requirement in section 516(b), as amended, which provides that "The Secretary shall direct the collector at such port to notify such complainant immediately when the first of such entries is liquidated." In the brief of the party in interest, counsel presents the same line of argument that was offered at the time of the original motion. (R. 3.) To support this phase of the motion to dismiss, the party in interest has cited the cases of *The Cronite Co., Inc.* v. *United States* (*W. E. Sellers, etc., Party In Interest*), 38 Cust. Ct. 76, C.D. 1847, affirmed in *W. E. Sellers* (*Party in Interest, Doing Business as John Sellers & Sons*) v. *The Cronite Co., Inc.*, 45 C.C.P.A. (Customs) 27, C.A.D. 668 (cross-appeal); *Reed & Barton et al.* v. *United States*, 63 Treas. Dec. 941, T.D. 46422; *Lichtenstein* v. *United States*, 1 Ct. Cust. Appls. 79, T.D. 31105; and *United States* v. *E. H. Bailey & Co.*, 32 C.C.P.A. (Customs) 89, C.A.D. 291. All of those cases are readily distinguishable from the present situation as the following outline of each discloses.

In *The Cronite Co., Inc.*, case, it was held that, where liquidations were made on two separate days, only the protest filed in time against the first liquidation could be heard, and that a second protest filed against a second, or later liquidation, is not authorized by the statute. This is not the condition before us. Here, all four liquidations were made on the same day, and, in an affidavit executed by an employee of the liquidation division in the office of the collector of customs at the port of New York, the affiant testified that "since all four of these entries were liquidated at the same time it is impossible to state whether any of these four entries was liquidated before the other three."

In the *Reed & Barton et al.* case, there was a positive showing that plaintiffs did not protest the first liquidation of which they were notified. In the present case, plaintiff has complied with that condition precedent to the valid protests now before us.

The *Lichtenstein* and *E. H. Bailey & Co.* cases involved the sufficiency of protests, emphasizing particularly the requirement that the plaintiff shall state his claim "with such reasonable clearness and certainty as to acquaint the collector with the real ground of

his complaint," the *Lichtenstein* case, *supra*. No such question is involved herein.

Since there is nothing before us now, which was not considered previously in connection with this phase of the motion to dismiss, hereinabove discussed, we have no reason for changing our earlier action, denying the motion (ORDER of March 12, 1959).

The second reason for dismissal advanced by the party in interest is that the merchandise covered by the protests before the court fails to comply, in important respects, with the description of the imported product to which plaintiff directed its complaint in proceeding under section 516(b) of the Tariff Act of 1930, as amended. The contention is without merit. While the statute, section 516(b), as amended, requires the American manufacturer or producer, in his protest, to set forth "a description of the merchandise, the classification, and rate or rates of duty he believes proper," it cannot be concluded therefrom that the protest filed with this court shall refer specifically, and in every detail, to the description of the merchandise set forth in the complaint filed with the Secretary of the Treasury. The protests before us describe the merchandise as follows:

The merchandise as to which this complaint is directed consists of cellulose sponges of foreign manufacture imported in block form, sheet form or in compressed sheets, and having the same chemical origin and basically the same composition as apply to the complainant's product.

Whatever variance there may be between the identification of the merchandise in these protests and the description given in the complaint to the Secretary of the Treasury, it did not mislead or affect the conduct or the procedure followed by the party in interest in the course of the trial, where it was stipulated between the parties that the commodity in question is a compound of cellulose and that the sole question for determination is whether the imported merchandise is made into finished or partly finished articles, i.e., sponges. That the party in interest was fully apprised of this specific issue, is reflected not only through the evidence it introduced, but also from the cross-examination of plaintiff's witnesses by counsel. The motion to dismiss is overruled in all respects. The record shows that plaintiff complied with all the requirements necessary to invoke the jurisdiction of this court by valid protest, pursuant to the provisions of section 516(b), as amended.

As to the merits, there is no dispute concerning the processes that were followed in producing the imported merchandise. The basic materials consist of two caustic solutions of different concentrations, a sodium sulfate solution, and wood pulp sheets. One of the caustic solutions is used to mercerize the wood pulp sheets to form alkalicellulose that is pressed into a desired cellulose caustic ratio. The alkalicellulose is processed through a shredder to give crumbs of

greater surface. The crumbs of alkalicellulose are treated with carbon bisulfide in a churn to form sodium cellulose xanthate. With the use of the second caustic solution, the xanthate is dissolved into viscose. The sodium sulfate solution is used to acquire Glauber's salt crystals. It is crystallized in tanks, and, after cooling, the crystals are crushed and sifted, and the metallic particles are removed by magnets. The reinforcing fibers are cut to proper length and treated so they may be dispersed into the viscose without forming harmful lumps. The viscose, Glauber's salt crystals, and reinforced fibers are thoroughly mixed in proper proportions, and, with the addition of dyes, produce the sponge mass that is cast into forms or molds and subjected to heat. The heat serves to melt out the Glauber's salt crystals, coagulate the viscose, and regenerate the cellulose, so as to form the voids or empty cells that become the pores in the cellulose sponge. Before removing the sponge blocks from the molds, they are treated with water in counter-flow systems so as to dissolve out the greatest amount of salt. After removal from the molds, the sponge blocks are given further washing to remove all trace of any remaining Glauber salt and then immersed in a bleaching bath. The sponge blocks are again washed to remove the bleaching agent, then dried, and finally packed for shipment.

Samples of the imported sponge blocks are in evidence. One is rectangular in shape, measuring about 31 inches in length, 4 inches wide, and 2½ inches thick (plaintiff's exhibit 8). The other is oval, measuring about 5¼ inches in greater and 3¾ inches in lesser diameter, and 32 inches long (plaintiff's exhibit 9).

The testimony of plaintiff's witnesses will support the following summary with respect to the condition of the merchandise at the time of importation and the treatment applied thereafter. Processing the raw materials to the condition of the imported sponge blocks is a chemical process. When the viscose, the Glauber's salt, and the reinforcing fibers are combined or thoroughly mixed, the product has become irrevocably committed to the manufacture of cellulose sponges. They will absorb "1660 per cent of water" (R. 88) compared to their bone dry weight. Because their size at the time of importation is so "unwieldy," these sponge blocks are not susceptible of immediate commercial use, but require certain treatment or manipulation, consisting of the application of a softening agent, the cutting to suitable sizes, and packaging. All of those operations, subsequent to importation, promote the marketability of the sponges. The vast majority of cellulose sponges have had a softening agent added before they are sold at the retail level. The usual softening agent is a solution of glycerine and water. Its purpose is to retain, or slow the evaporation of, water. The additive is not permanent, but is washed out within a few minutes after the sponge is used. The use of the softening agent

is becoming "less and less important" because "sponges are being merchandised more and more, namely in what we call a wet package, or damp package, namely in a polyethylene bag" (R. 125), which acts as a protecting agent to prevent the sponge from drying out. After the addition of the softening agent, the sponge blocks are cut into various desirable or useable sizes and then packaged in a plastic bag. Neither the addition of a softening agent nor the cutting process affects the absorptive capacity or the texture of the sponges.

Some sponges—a relatively very small quantity—are sold without the use of a softening agent. Office buildings, bank buildings, and certain governmental agencies, where appearance is not a consideration, use cellulose sponges without an additive.

The use of sponges is because of their absorptive capacity. The absorption quality or capacity of these imported sponge blocks (exhibits 8 and 9, *supra*) is sufficient for the products to be used wherever "absorption is a desired quality, whether it is washing, or rinsing, or wiping, or polishing, or containing a detergent, or any such use, which is basically use of the absorption." (R. 112.)

Comparative tests were made between a section of an imported sponge block (plaintiff's exhibit 10) and certain cellulose sponges that had been cut to sizes as they are sold in the open market in a plastic bag (plaintiff's collective exhibit 11), produced and marketed by the party in interest (American Sponge & Chamois Company, Inc.). The only differences between the products appeared to be the matter of size or shape and the presence of a softening agent in the sponges of domestic manufacture (collective exhibit 11) and the absence thereof in the imported sponge (exhibit 10). Comparing the imported sponge block (exhibit 10, *supra*) with the specifications for cellulose sponges (plaintiff's collective exhibit 13), issued by the General Services Administration, an agency of the Federal Government that is a major user of cellulose sponges, it was found that the merchandise in question meets all of the requirements of the "type 1 sponge, which is the coarse pore sponge" (R. 80), purchased by the General Services Administration.

The evidence adduced by the party in interest presents no serious contradiction with that offered by plaintiff. The vice president and treasurer of the American Sponge & Chamois Co., Inc., explained in detail the processes followed by the party in interest in making the imported sponge blocks available as commercially marketable commodities. His testimony on that point is substantially as follows:

The imported sponge blocks are steeped in a chemical bath, containing four separate chemicals. Two of the chemicals are softening agents; another is for the purpose of maintaining the correct acidity of the blocks; and the fourth chemical acts as a mold inhibitor. Then, the blocks are put into specially designed squeeze rollers that adjust

the products to proper moisture content. While the blocks are still wet, they are put through specially designed cutting equipment which, in one cutting operation, slices the blocks into desired smaller sizes. The blocks are not dedicated to any particular thickness or any specific number of individual sponges. They are cut into many different sizes and unusual shapes. After the cutting operation, the individual sponges are placed on a conveyor belt that moves them to "an assembly line of girls who insert them individually into polyethylene bags," that have "a moisture retention value," and which, with the softening agent, prevent the sponges from drying out in the package while they are on shelves awaiting purchase by a customer. All of the processing after importation improves the appearance, rather than the utility, of the sponges and promotes their commercial salability.

Although the witness testified that there "are probably well over 200 or more uses" (R. 162) for sponge blocks, such as or similar to the merchandise in question, he admitted that "well over 90 to 95 per cent" (R. 161) of the imported sponge blocks (exhibits 8 and 9, *supra*) are cut and packaged into the familiar cellulose sponges as they are sold over retail counters (collective exhibit 11, *supra*). After identifying different kinds of articles showing the various uses of sponge blocks and describing other uses therefor, the witness explained that the sponge blocks in question could not be used for every purpose, stating that "we have special blocks for special manufacturers." (R. 183.) He corroborated testimony of plaintiff's witnesses to the effect that the desirable property of the imported sponges—and one that makes them valuable commercial commodities—is their absorptive capacity.

Both parties introduced testimony with reference to the costs incurred by the foreign manufacturer in producing the imported merchandise, as compared with the cost of processing after importation. Such testimony, as it appears herein, is not material to the question before us, i.e., whether or not these sponge blocks (exhibits 8 and 9, *supra*) are made into finished or partly finished articles.

Plaintiff cites the case of *J. B. Henriques, Inc.* v. *United States*, 46 C.C.P.A. (Customs) 54, C.A.D. 695, which involved an issue substantially the same as that before us in the present case. In the cited case, the merchandise consisted of certain rectangular pieces of acrylic resin that had been cast into sheets of specific sizes, making the imported articles available for no other commercial use than in the making of transparent lids for ice-cream dispensers. The sole question therein was whether the merchandise was to be regarded as cellulose acetate in sheets, as assessed, or cellulose acetate, made into finished or partly finished articles. In its approach to the question, our appellate court pointed out that the "exact point in the processing of raw material at which it becomes a partly finished article or manufacture

is a matter which must be determined on the basis of the circumstances of the particular case involved" and, in discussing the controlling considerations, stated as follows:

It is not possible from the authorities such as we have hereinbefore enumerated to formulate any general principle which can be universally applied. The decisions appear to have been made on the basis of an appraisal of the particular facts of the respective cases. They were obviously rendered in the light of such considerations, for example, as the extent of the changes made in the raw material; the amount of the work remaining to be done before a finished article could be produced; the similarity between the article as imported and the final product; and whether the work on the imported merchandise was done primarily to facilitate the shipping thereof or to advance the article toward completion.

In the *J. B. Henriques, Inc.*, case, the court held the merchandise to be partly finished articles and based its conclusion on a finding that:

* * * the pieces of merchandise are cut by specification to exact dimensions which closely approximate those of their final form and which, so far as appears, do not adapt them for any purpose other than the making of lids, and do not particularly facilitate their shipment.

In this case, the raw materials of viscose, Glauber's salt crystals, and reinforcing fibers are mixed to specific proportions and chemically processed to create a sponge mass with all of the desirable properties of cellulose sponges. The subsequent heat treatment, in molds or forms, which coagulates the viscose, removes the Glauber's salt, and regenerates the cellulose, advances the condition of the sponge mass and produces the imported sponge blocks that possess the required absorptive capacity, as well as the desired quality and texture, of cellulose sponges. The sponge blocks in question, like the acetate lids that were involved in the *J. B. Henriques, Inc.*, case, were adapted, at the time of importation, to no other purpose than their ultimate use.

The handling of these sponge blocks, after importation, added nothing to the merchandise as cellulose sponges. The softening agent serves to retain moisture content and also facilitates slicing the blocks into desirable sizes. Its presence is merely temporary, as it washes out within a few minutes after the sponge has been used. Furthermore, it is used only where appearance is a consideration in merchandising the sponges. Cutting the imported sponge blocks is limited to the desired thickness. The cutting process does not affect, in any way, the important properties, of absorption and texture, of the sponges. Finally, the packaging of the sponges in plastic bags is to attract prospective purchasers. The sole purpose of the manipulations of the sponge blocks after importation is to promote the marketability of the products.

An issue, comparable to that presented herein, was involved in *United States* v. *Geo. S. Bush & Co., Inc.*, 16 Ct. Cust. Appls. 478, T.D.

43222, and *United States* v. *American Hecolite Denture Corp.*, 21 C.C.P.A. (Customs) 131, T.D. 46465. Although both cases arose under the Tariff Act of 1922, the competing provisions were substantially the same as those involved herein. In each case, the merchandise consisted of hecolith base plates, U-shaped, or horseshoe-shaped, in varying sizes and shapes, chiefly used by dentists to make plates for artificial teeth. The articles were made, prior to their importation, by the use of a material of German origin, called hecolith, which was usually first processed into blocks or sheets. A portion of the hecolith was placed in a mold and compressed under heat until it assumed the form of the imported article, usually following the curvature of the gums in the human mouth. The sides of the plates into which the teeth were pressed were concave, and the other sides were more or less convex or raised. After importation, the hecolith plates were subjected to processing, stabilizing the articles from shrinkage and warpage, and making them fit for use as dentures. In holding the merchandise to be properly classifiable as compounds of cellulose, made into partly finished articles, our appellate court emphasized, in each of the cited cases, that processing the articles to their imported condition fitted them for their ultimate use. The same is true with respect to the sponge blocks under consideration, which, at the time of importation, had been processed to a condition in which they had acquired all of the attributes of cellulose sponges.

In *United States* v. *Guggenheim Bros. Dental Supply Co.*, 22 C.C.P.A. (Customs) 613, T.D. 47604, the merchandise consisted of certain cellulose material, rectangular in shape (except that two of its corners were cut away), with flat surfaces. The merchandise was ultimately used for making plates for artificial dentures, but it had to be subjected to a rather elaborate series of processes, after importation, to become available for its final use. The appellate court, distinguishing the *American Hecolite Denture Corp.* case, *supra*, held that the cellulose material had not been advanced in manufacture to a point where it bore "even a resemblance in shape to the finished articles" into which it was eventually fashioned, and, therefore, concluded that the merchandise was not made into finished or partly finished articles. The present case is distinguishable. Here, the imported sponge blocks are committed, by virtue of their absorptive capacity and texture, as well as their color and shape at the time of importation, to use as cellulose sponges.

Under the reasoning followed and the statutory construction enunciated in the *Geo. S. Bush & Co., Inc.*, the *American Hecolite Denture Corp.*, and the *Guggenheim Bros. Dental Supply Co.* cases, *supra*, the sponge blocks in question are compounds of cellulose, made into finished or partly finished articles.

The party in interest cites the cases of *United States* v. *The Harding Co.*, 21 C.C.P.A. (Customs) 307, T.D. 46830, and *The Harding Co. et al.* v. *United States*, 23 C.C.P.A. (Customs) 250, T.D. 48109. Both cases involved asbestos brake linings that were claimed to be parts of automobiles. Since the primary question therein was controlled by the principle of "parts" of articles, which has no application herein, the last two cited cases have no influence toward a disposition of the issue now before us.

Counsel for plaintiff and counsel for the party in interest, in their respective briefs, refer to other cases not heretofore mentioned. Consideration has been given to all of them, but a discussion thereof at this time would add nothing further toward our conclusion.

On the basis of the present record and for all of the reasons hereinabove set forth, we hold that the sponge blocks in question are properly classifiable under the provision for compounds of cellulose, made into finished or partly finished sponges, in paragraph 31 (b) (2), as amended, *supra*, and dutiable thereunder at the rate of 40½ per centum ad valorem, as claimed by plaintiff.

The protests are sustained and judgment will be rendered accordingly.