(C.D. 2615)

R. J. Saunders & Co., Inc. *v*. United States

United States Customs Court, First Division

(Decided February 7, 1966)

*Jordan & Klingaman* (*Edward F. Jordan* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Mollie Strum*, trial attorney), for the defendant.

Before OLIVER, WILSON, and NICHOLS, Judges

OLIVER, Judge: The merchandise involved in this protest was described on the invoices as "cellulose sponge cloth on rolls," imported in lengths of 100 meters or approximately 110 yards and in roll sizes A, B, and C. Size A has a width of 8 inches and comes in thicknesses ranging from $\frac{1}{16}$ to $\frac{3}{32}$ of an inch. Size B is $10\frac{1}{4}$ inches wide and $\frac{3}{32}$ of an inch thick. Size C is 32 inches wide and measures $\frac{1}{4}$ inch in thickness. The merchandise was classified under paragraph 31 (b)(2) of the Tariff Act of 1930, as modified by T.D. 54108, as compounds of cellulose, made into finished or partly finished sponges, and assessed with duty at the rate of 38 per centum ad valorem.

It is the importer's claim that the merchandise is properly classifiable as compounds of cellulose in sheet form, not made into finished or partly finished articles, under paragraph 31(b)(1) of said act, as modified by T.D. 52739, supplemented by T.D. 52763, and dutiable at the rate of 20 cents per pound.

The relevant portions of the tariff act, as modified, are as follows:

Paragraph 31(b)(2) of the Tariff Act of 1930, as modified by T.D. 54108:

All compounds of cellulose (except cellulose acetate, but including pyroxylin and other cellulose esters and ethers), and all compounds, combinations, or mixtures of which any such compound is the component material of chief value:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Made into finished or partly finished articles of which any of the materials provided for in paragraph 31(b)(1), Tariff Act of 1930, is the component material of chief value, not specially provided for (except articles made in chief value from transparent sheets, bands, or strips not more than 0.003 inch thick, and except smokeless powder):

Sponges _____ 38% ad val.

Paragraph 31(b)(1) of the Tariff Act of 1930, as modified by T.D. 52739, as supplemented by T.D. 52763:

All compounds of cellulose (except cellulose acetate, but including pyroxylin and other cellulose esters and ethers), and all compounds, combinations, or mixtures of which any such compound is the component material of chief value:
> In blocks, sheets, rods, tubes, powder, flakes, briquets, or other forms, whether or not colloided, not made into finished or partly finished articles:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

> Other _____ 20¢ per lb.

Upon the trial, plaintiff introduced into evidence 10 illustrative exhibits, consisting in the main of samples of the merchandise, both as imported and as sold to ultimate consumers, as well as various photographs illustrating the manner in which the merchandise is imported. (The only variation is in the color of the merchandise and this is deemed immaterial.) Plaintiff also called two witnesses.

Mr. Gosta Sandemar, plaintiff's first witness, testified that he was the president of the corporation "Products from Sweden," the company for whose account the merchandise was imported. He stated that he was personally familiar with the invoiced merchandise. He identified plaintiff's illustrative exhibit 1 as a photograph showing the form in which the merchandise is imported. He further identified plaintiff's illustrative exhibits 3, 4, and 5 as pieces of the imported sponge cloth cut from roll sizes A, B, and C, respectively.

He stated that the cut pieces show the exact width and thickness of the merchandise as imported. However, none of the three roll sizes, each imported in 110-yard lengths, bear any marks to indicate where they are to be cut for the subsequent uses to which they are put. His company does no processing at all, but sells the merchandise as imported to but one customer, the American Sponge and Chamois Co. The merchandise is sold to this customer as cellulose sponge cloth in rolls.

Plaintiff's second witness was Mr. Charles Lipsig, a vice president of the American Sponge and Chamois Co. in charge of their cellulose division, which handles both block sponges and sponge cloth. Mr. Lipsig testified that his company is the sole purchaser of the involved merchandise, purchasing it under the name of cellulose sponge cloth. His company has handled this product since 1953. He identified the photographs and the samples previously introduced into evidence as the merchandise in the condition in which they buy it from the importer. He agreed to the dimensions as stated by Mr. Sandemar

and repeated that the rolls of sponge cloth have no prefixed markings for cutting purposes.

With respect to roll sizes A and B, the witness related the following steps of processing by his company after importation but prior to resale: Rolls A and B are cut to approximately six different sizes; they are put through a chemical bath containing four different chemicals; two of the chemicals act as a plasticizer to keep the sponge cloth soft, a third chemical acts to maintain the pH of the material, that is, the proper acidity; a fourth chemical acts as a mold inhibitor; they are packaged in various sized plastic envelopes to keep them damp.

After packaging, they are sold to various types of wholesalers and sometimes direct to business consumers as "AMSCO Sponge Cloth." The sponge cloths are mainly used for household wiping chores, ranging generally from washing dishes, windows, woodwork, and tile to polishing and wiping the family automobile. One size is specified for use as a baby's washcloth and another has been used in washing the udders of a cow. Plaintiff's illustrative exhibit 6 was identified as a 7- by 8-inch dishcloth, cut from roll size A. In this regard, the witness stated that the waffle-side, to which the printed material in the package refers, is the same as the waffle structure on the imported roll. Each roll of material contains this waffle-like design in its imported condition. The witness also identified plaintiff's illustrative exhibit 7 as their "Automagic Sponge Cloth," cut from roll size B and used in drying an automobile. Plaintiff's illustrative exhibit 8 is the same as illustrative exhibit 7, except that the cellophane bag has been opened for closer examination of the merchandise.

Finally, Mr. Lipsig testified that roll size C, plaintiff's illustrative exhibit 5, is sold just as imported, i.e., in 110-yard lengths, to one particular purchaser, a manufacturer of transistors. This purchaser cuts it down to various sizes and uses it for wiping its factory equipment.

On cross-examination, Mr. Lipsig testified further that the roll C size sponge cloth is sold to the transistor manufacturer in the same condition it is in when imported, i.e., uncut and untreated with the above-mentioned chemical baths.

On redirect, the plaintiff introduced illustrative exhibits 9 and 10, the former showing the imported rolls wrapped in polyethylene for protection during transit into the country and the latter, indicating the drum containers in which they are packed.

On recross, the witness explained that the merchandise when wet will expand between 15 and 20 percent in width and 100 percent in thickness, but when dry again it will return to its imported condition. Finally, Mr. Lipsig stated that this merchandise had been used in

experimentation with astronauts in the space program. They used it inside a space suit connected with hoses for washing purposes. The sponge cloth absorbed the excess moisture inside the suit.

It is plaintiff's contention that the involved merchandise is a mere material in 110-yard lengths requiring further processing and, in its imported condition, not yet advanced into finished or partly finished articles. Defendant, on the other hand, maintains that the imported merchandise has been processed, at the time of importation, into partly finished sponges and relies on *United States et al.* v. *Nylonge Corporation*, 48 CCPA 55, C.A.D. 764, as controlling authority. The collector at the port of New York classified the merchandise herein under paragraph 31(b)(2) pursuant to the decision abstracted in T.D. 55599(21), wherein the Bureau of Customs issued instructions to follow the decision in the *Nylonge* case, *supra*, with respect to cellulose sponge sheets of similar physical properties and use as the sponge blocks or loaves before the court in that decision.

In the *Nylonge Corporation* case, *supra*, the same two sections of paragraph 31(b) were in contention. The collector had classified the merchandise, imported sponge blocks—one rectangular in shape and measuring 31 inches long, 4 inches wide, and 2½ inches thick and the other in oval shape measuring 5¼ inches in greater and 3¾ inches in lesser diameter and 32 inches long—under paragraph 31(b)(1), and the plaintiff therein, via the American manufacturer's protest provisions in section 516, as amended, argued for classification under paragraph 31(b)(2), as partly finished sponges. The evidence given by the party in interest (the American Sponge & Chamois Co., Inc.), regarding the processing of the merchandise after importation and before sale to the ultimate consumer, was summarized by the trial court and cited by the appellate court as follows:

The imported sponge blocks are steeped in a chemical bath, containing four separate chemicals. Two of the chemicals are softening agents; another is for the purpose of maintaining the correct acidity of the blocks; and the fourth chemical acts as a mold inhibitor. Then, the blocks are put into specially designed squeeze rollers that adjust the products to proper moisture content. While the blocks are still wet, they are put through specially designed cutting equipment which, in one cutting operation, slices the blocks into desired smaller sizes. The blocks are not dedicated to any particular thickness or any specific number of individual sponges. They are cut into many different sizes and unusual shapes. After the cutting operation, the individual sponges are placed on a conveyor belt that moves them to "an assembly line of girls who insert them individually into polyethylene bags," that have "a moisture retention value," and which, with the softening agent, prevent the sponges from drying out in the package while they are on shelves awaiting purchase by a customer. *All of the processing after importation improves the appearance, rather than the utility,*

*of the sponges and promotes their commercial salability.* [Italics supplied.]

Commenting with particular reference to the postimportation chemical bath process, the appellate court concluded:

The chemical treatment of the merchandise after importation is without significance in resolving the issues here. The treatment serves only to keep the material soft and free from mold. This affects only the salability of the product. As a matter of fact, these chemicals wash out after the sponges are used. The utility of the product is in the absorption ability which exists in the imported goods. * * *

The complete similarity between the chemical processing in the *Nylonge* case, *supra*, and that involved in this case is undeniable. The instant sponge cloth is sold and used for its absorbent utility in wiping and drying various household articles. Whatever "spongibility" it employs was present in its imported state and was not materially affected by its postimportation treatment. It was imported as cellulose sponge cloth and sold, as is, as sponge cloth. The waffle-like design, which, as plaintiff's exhibit 6 points out, acts as various suction cups for holding more water, was present in the merchandise as imported. Moreover, as developed at trial, roll size C is sold for use as sponge cloth without the addition of the various chemical bath treatments.

There is no real dispute here that the involved merchandise is other than a sponge substance. Actually, plaintiff's main argument for distinguishing the *Nylonge* decision from the present protest is based on the relative differences in the sizes of the imported merchandise. Plaintiff relies on the following observation of the court in that case:

* * * At the outset, we may say that the importations were obviously formed in the rectangular and oval shapes having specified dimensions for a definite reason. * * *

However, this observation was made with respect to the fact developed during the trial that " 'well over 90 to 95' percent of the imported sponge blocks are cut and packaged into the familiar cellulose sponges as they are sold over retail counters." *Cf. Nylonge Corporation* v. *United States* (*American Sponge & Chamois Co., Inc., Party in Interest*), 44 Cust. Ct. 1, 7, C.D. 2144. Such evidence was indicative of sufficient dedication of the imported material for use in making sponges of various shapes and thicknesses, it being well established that merchandise need not be dedicated to the making of a single article to be a partly finished product. *J. B. Henriques, Inc.* v. *United States*, 46 CCPA 54, 56, C.A.D. 695. The sponge blocks were, as imported, "unwieldy" and not susceptible to commercial use. They

were not dedicated to any particular thickness nor any specific number of individual sponges and required cutting into many different sizes and shapes. Nevertheless, as the trial court observed, "The cutting process does not affect, in any way, the important properties, of absorption and texture, of the sponges."

The merchandise before us, except as to the particular purchase of roll size C, is of a commercially unfit size. Its dimensions, however, as to width and thickness, together with its waffle-like design, readily distinguish it for its one essential use, that is, as sponge cloths for six different sizes for various household wiping chores. In this regard, it will be noted that the required cutting operation is limited to the desired lengths of the various end products; whereas, in the *Nylonge* case, *supra*, the blocks required cutting in both length and thickness. What was said in that case can be stated here, namely, that the cutting process in no way affects the important properties of absorption and texture, and the merchandise is useful in this respect before, as well as after, cutting.

Plaintiff has cited many cases dealing with the proposition of when a material is to be regarded as finished or partly finished for tariff purposes. Most of these cases were discussed and found to be non-determinative of the situation before the court in the *Nylonge* decision, *supra*. The cases cited by plaintiff, as well as those reviewed by the court in *J. B. Henriques, Inc.*, *supra*, reaffirm the observation made by the appellate tribunal in that case and relied upon by the court in the *Nylonge* decision, viz:

It is not possible from the authorities such as we have hereinabove enumerated to formulate any general principle which can be universally applied. The decisions appear to have been made on the basis of an appraisal of the particular facts of the respective cases. * * *

The cases have ranged from situations dealing with the question whether certain articles have been sufficiently advanced in manufacture to be "parts" of other enumerated articles, as in *United States* v. *The Harding Co.*, 21 CCPA 307, T.D. 46830, and *The Harding Co. et al.* v. *United States*, 23 CCPA 250, T.D. 48109, cited by plaintiff, to whether certain material, specifically provided for in several provisions of one paragraph, has been so manipulated or formed so as to be partly manufactured articles, as was before the courts in the "onyx" cases. *Mutual Lamp Mfg. Co.* v. *United States*, 21 CCPA 231, T.D. 46762; *Atlas Export Co. et al.* v. *United States*, 43 CCPA 122, C.A.D. 618.

Not only do differing fact situations prohibit the formulation and application of a general principle applicable to the various cases cited by plaintiff but the changing expressions of legislative intent, as

embodied in the different provisions under consideration in each case, increase the difficulty for precedent.

Based upon a review of the cases in this area, we feel the *Nylonge* case alone has application to the issue before us. The fact situations are similar and the competing provisions the same. The *Nylonge* case involved blocks of material, too long and too thick for immediate commercial use, while the present merchandise is in lengthy sheet form, normally too large for commercial sale. However, the mere fact that the material was imported in block or sheet form does not prescribe it for classification under paragraph 31(b) (1) which, *inter alia*, calls for compounds of cellulose, in blocks or sheets, *not made into finished or partly finished articles*. Moreover, in each instance, the raw material named in the paragraph had been advanced qualitatively, at the time of importation, into sponge blocks or sponge cloth possessing the properties essential for its end use, viz, absorption and texture. So, too, in each instance, the particular design and shape of the imported article had been sufficiently formed for a definite reason. In the *Nylonge* situation, the rectangular and oval shape of the sponge blocks sufficiently dedicated them, although not absolutely, for subsequent cutting into household sponges of various lengths and thicknesses. In the instant case, the sponge cloth sheets are imported in flat, waffle-like design, cut to exact width and needing only additional cutting into various lengths [1] for their intended use as household sponge cloths.

For all of the foregoing reasons, we hold that the collector's classification of the involved merchandise under paragraph 31(b) (2), as modified, as compounds of cellulose, made into finished or partly finished sponges, is correct and plaintiff's protest is hereby overruled.

Judgment will be rendered accordingly.

(C.D. 2616)

---

[1] Significantly here, plaintiff's illustrative exhibits 7 and 8 indicate that by use of scissors the larger auto sponge cloths can be cut into any desired size for internal household use.