For the reasons stated, the protest is overruled and judgment will be rendered for the defendant.

(C.D. 2831)

F. B. Vandegrift & Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided November 25, 1966)

*Allerton deC. Tompkins* for the plaintiff.

*Barefoot Sanders*, Assistant Attorney General (*Sheila N. Ziff* and *James S. O'Kelly*, trial attorneys), for the defendant.

Before OLIVER, NICHOLS, AND WATSON, Judges

NICHOLS, Judge: The merchandise involved in this case consists of rectangular pieces of glass imported from Belgium and entered at the port of Philadelphia on May 31, 1962.[1] The collector liquidated at 42½ per centum ad valorem under paragraph 218(a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739 and T.D. 52820, as glass laboratory articles. Plaintiff claims the merchandise is dutiable at 0.7 cent per pound or at the appropriate rate according to measure under paragraph 219 of said tariff act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as cylinder, crown, or sheet glass, by whatever process made and for whatever purpose used.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 218(a), as modified by T.D. 52739 and T.D. 52820:

| | |
|---|---|
| Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds, including all scientific articles, and utensils, whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise, all the foregoing (except articles provided for in paragraph 217 or 218(e), Tariff Act of 1930), finished or unfinished, wholly or in chief value of glass _____ | 42½% ad val. |

Paragraph 219, as modified by T.D. 54108:

| | |
|---|---|
| Cylinder, crown, and sheet glass, by whatever process made, and for whatever purpose used: not over 384 square inches_____ * * * | 0.7¢ per lb. |
| *   *   *   *   *   * | * |
| *Provided*, That none of the foregoing weighing under 16 ounces but not under 12 ounces per square foot shall be subject to a less rate of duty than____ * * * | 17% ad val. |

[1] This case was heard in Philadelphia before Judge Ford on November 17, 1964, and before Judge Nichols on March 10, 1965. It was submitted on the latter date. Plaintiff's brief was filed on August 25, 1965, and defendant's brief on May 27, 1966.

Counsel stipulated at the trial that:

The merchandise under protest consists of glass in the form of rectangles, 76 x 26 millimeters by 3/64 inches thick (plus or minus .007 inches allowance on sizes) and not over 384 square inches per pound, packed, 75 pieces to the package as represented by the sample herewith submitted, which with the approval of the Court, may be received into evidence as Exhibit 1.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

\* \* \* that the glass rectangles under protest do not consist of glass weighing under 16 ounces, but not under 12 ounces per square foot.

Plaintiff called three witnesses: Robert C. Hordis, who is a partner in the firm of Hordis Bros., the importer, and is president of two related concerns; Frank Carson, an instrument maker and salesman, who has handled micro-slides for 35 or 40 years; and Robert E. Larrimore, a laboratory technician.

Mr. Hordis testified that the business of the firms he is associated with is to purchase sheet, plate, and roll glass, and to manufacture therefrom articles for use in industry, in laboratories, and wherever glass can be used. He had ordered and purchased the merchandise involved herein and had handled that type of glass for about 9 years. He said it was sheet drawn glass or sheet glass. It is made by being drawn in a sheet form out of a batch of molten glass and is identified by the fact that it has some slight distortion. The merchandise herein is "B" quality, meaning that it may have a number of small inclusions, such as bubbles or particles. According to the witness, the dimensions do not affect its status as sheet glass, since sheet glass may be ordered in any size desired. He explained:

\* \* \* The glass, as it is made, might be in panels the size that small, 9 feet by 7 feet. It depends upon what size they trimmed it to at the top of their machine. This can't be shipped that way. It is too fragile, and they must cut it down to another size to ship it to their customers.

After importation, the pieces are processed into finished micro-slides by grinding and polishing the edges and by cleaning the surface and the edges. The purpose of the grinding and polishing is to remove sharp flares and small edge chips, and to obtain the dimensions required for micro-slides by Federal Specifications, namely, 75 millimeters by 25 millimeters with a tolerance of plus or minus $\frac{4}{10}$ths of 1 millimeter. The glass rectangles are cleaned to remove oily deposits, fingerprints, and contaminants, so that the slides, when sold, are absolutely clean. As regards the surfaces, the operation consists of the cleaning only. The slides are then inspected to check dimensions and cleanliness and for scratches, and slides which are defective are removed. The completed slides are packed 72 to a box.

The slides must meet the requirements in Federal Specification NNN-S–450 (plaintiff's exhibit 2) and military medical purchase specifications (plaintiff's exhibit 3) when sold to the Government, to city and state agencies, and to the Military Medical Department. The court received these specifications for whatever relevance they might have. It deems them relevant as substantiating that without the grinding, polishing, and cleaning described, the slides would not be acceptable as micro-slides.

Mr. Carson and Mr. Larrimore testified that micro-slides are used primarily for making blood smears. A smear is taken to aid the doctor and, if it is erroneous, that will hinder his diagnosis. To make a smear, a drop of blood is placed on one slide, and another slide is held at an angle of 45 degrees and is pushed over the surface of the first slide, so that a very thin film is deposited over the surface. Then it is stained and examined under a microscope. If the slide does not have a perfect edge, it will cause streaking; the blood will not be evenly dispersed, and some of the white cells may be broken. That could cause a distorted cell count. The edges must also be polished and ground to prevent the operator from being cut in handling slides, since if he gets a cut or abrasion, he may be infected by the smear from an infected patient. Cleanliness is also important because the presence of contaminants could result in a false reading under high magnification and an oily or waxy contaminant would not allow a uniform deposit of the specimen. When an operator gets a slide, it is supposed to be free from every defect; if it has a foreign particle on it, the specimen may be obscured, and if it has to be cleaned, it may develop scratches and chipping. Mr. Larrimore testified that, where he is employed, recleaned slides are used for other purposes, but not for blood differentials.

The slides must have the dimensions 75 by 25 millimeters because they are kept in standardized boxes or straining racks. If the slide is too large, it won't fit, and if it is too small, it will fall out or against another slide. Small holders are used to separate slides, so that they do not stick together. The microscope itself is not a factor in determining the size of the slide.

The witnesses testified that glass rectangles in the condition as imported could not be used in laboratories or for scientific purposes. Mr. Larrimore stated that, if they were ground to size, washed, and polished, they would meet the specifications of microscope slides.

Mr. Hordis regarded the imported merchandise as sheet drawn glass, a raw material, not a finished product, not even a micro-slide. He said it is imported in the size here involved to facilitate the manufacture of micro-slides and because it is easier to handle in the processing operation than a larger sheet would be. In addition to making

micro-slides, on two occasions his firm cut small circles out of the imported rectangles and sold them to a gauge manufacturer.

The issue before the court is whether the imported glass rectangles are classifiable as scientific articles, unfinished, or as sheet glass, by whatever process made and for whatever purpose used. Finished microscope slides have been held not to fall within the provisions of the predecessor to paragraph 219, *supra*, as cylinder, crown, or sheet glass, on the ground that they had been manufactured from the kind of glass provided for into completed articles of commerce exclusively appropriated to a given purpose and use and had been excluded from other commercial uses. *Thomas Co.* v. *United States*, 12 Ct. Cust. Appls. 425, 429–430, T.D. 40591. Cover glasses for use in connection with slides used to mount specimens for microscopic examination (including blood smears) have been held classifiable as "scientific glass articles" under paragraph 218(a), Tariff Act of 1930, rather than as "optical glass" under paragraph 227. *United States* v. *Central Scientific Co.*, 21 CCPA 214, T.D. 46749. In that case, the court discussed the glassware paragraphs and pointed out that the Congress intended to distinguish between manufactured products and raw material. It found that the cover glasses were not material, but finished articles, completely dedicated to one use, and were, therefore, manufactures of glass and not optical glass. Since they were scientific articles, they were held properly classified as such under paragraph 218(a). On the other hand, in *United States* v. *Clay Adams Co. Inc.*, 24 CCPA 150, T.D. 48625, it was held that crown glass imported in sheets, and cut, only after importation, into small squares for use in the manufacture of microscopic cover glasses was classifiable as "crown glass" under paragraph 219 rather than as "scientific articles" under paragraph 218(a). Such use was the chief use, but it also had employment for covering mirrors, in cheap jewelry, and in polariscope glasses.

In *United States (American Sponge & Chamois Co., Inc., Party in Interest)* v. *Nylonge Corporation*, 48 CCPA 55, C.A.D. 764, our appellate court held that cellulose sponge material imported in blocks and subjected to a chemical bath after importation and cut into the desired sizes had been sufficiently advanced toward the completion of the finished product to be considered dedicated to its ultimate use. It was, therefore, held dutiable as "partly finished" sponges. If "partly finished" had a different meaning from "unfinished" it can hardly be one helpful to plaintiff herein. See also *R. J. Saunders & Co., Inc.* v. *United States*, 56 Cust. Ct. 85, C.D. 2615 (appeal pending). Cf. *B. A. McKenzie & Co., Inc., et al.* v. *United States*, 47 CCPA 42, C.A.D. 726, where it was held that plywood panels in sizes generally corresponding to the widths and lengths of doors of standard

sizes, known to some extent as "doorskins," were still "plywood" and classifiable under the *eo nomine* provision therefor, not "manufactures of wood." The court stated (p. 46) :

* * * Since to be a manufacture, the material must be so processed as to exclude a large portion of its original uses, the determination of whether or not an article is a manufacture must depend upon the facts presented in each case to show the nature of the material involved and the degree of processing to which it was subjected prior to importation. The manufacture of plywood panels in specified sizes does not change the nature of the product. The resultant "manufacture" still is plywood as that term is used in paragraph 405 of the Tariff Act of 1930 as amended.

The most recent decision of the court of appeals construing the term "unfinished" is *United States* v. *Fred Frankel & Sons*, 52 CCPA 81, C.A.D. 862. That case involved alabaster beads strung in graduated sizes on cords in excess of the length of the beads. After importation, the beads were divided into approximate halves by moving them to the ends of the long cords, leaving a long center section of the cord free. The portions with the beads were dipped into pearlizing baths, after which the beads were moved to the clean portions of the cords and the used portions were cut off. At that point, the articles were artificial pearl beads in their ultimate selling condition except for tipping the ends of the cords with fittings by which clasps were attached. Attachment of the clasps completed the necklaces. The issue before the court was whether the merchandise in its imported condition constituted unfinished jewelry. The court held that it did, stating (p. 85) :

* * * The articles of jewelry which they ultimately become are imitation pearl necklaces. There is no evidence that they ever become anything else. They are not merely strings of beads but are the necklaces in an unfinished form. The strings on which the beads are imported are the strings of the final necklaces, the beads are arranged thereon in their final order, never being removed therefrom. The lengths of the strings of beads are substantially within a bead or two, if not always exactly, the lengths of the final necklaces. * * * In making multiple-strand necklaces a bead or two may be removed to obtain the proper drape and spacing of the separate strands but we cannot agree with appellee that the destiny of the imports as specific articles of jewelry—namely, necklaces,—is not determined until the manufacturer decides whether to make them up into single, double, or triple strand necklaces. In every case they become necklaces. We also disagree that the *unfinished* necklaces themselves must be known commonly or commercially as jewelry to come within the provisions of the statute.

* * * Where the ultimate destiny as necklaces is clear, we do not see that it is of much importance just which part of the manufacturing process remains to be done so as to make the jewelry "unfinished." [Emphasis quoted.]

Defendant's reliance on the above case appears well justified. In the instant case, the glass rectangles ultimately become micro-slides. There is no evidence that they become anything else, except for possible fugitive uses. Other of the original possible uses of the sheet glass from which the rectangles were cut have been excluded. The sizes of the imported pieces, within a millimeter, are the sizes of the finished slides. What remains to be done is finishing by grinding and polishing the edges and cleaning all the surfaces. While these operations are necessary to produce a slide ready for use by the ultimate customer, at the time of importation, the destiny of the rectangles was clear and was limited to being processed into salable micro-slides.

This case and *Empire Findings Co., Inc.* v. *United States*, 57 Cust Ct. —, C.D. 2830 (protest 61/7304), also decided today, appear to be the first to be reported under paragraph 218(a) wherein the meaning of "finished or unfinished" is the key question at issue. As there stated, authority interpreting the same words in other paragraphs exists, and there is no reason to doubt that the Congress intended it to control. Under such authority, there seems no more reason to doubt that the imported articles are in a tariff sense, unfinished forms of articles dutiable under paragraph 218(a) and, therefore, themselves enumerated under that paragraph.

Plaintiff, however, quotes the following statement from *Clay Adams Co., supra,* at page 155:

The Government contends that, because of its use for micro-scope cover glasses, the imported material should be classified as scientific articles under said paragraph 218(a). However, it will be observed that said paragraph 219 makes use immaterial, for it recites therein, "for whatever purpose used." We conclude, therefore, that the provision in said paragraph 219 for "crown glass" more specifically describes the imported goods than does the language in said paragraph 218(a), "scientific articles."

That case and this are easily distinguishable on their facts. The imported merchandise there had several uses and thus was not "dedicated" as an "unfinished" form of an article must be. This claim of the Government's was different from the collector's classification and, therefore, supported by no presumption of correctness. The observations of our appellate court must be construed as applying to the issue before it. Paragraph 219 described the imported merchandise more specifically because paragraph 218(a) did not describe it at all. If it was intended to say that paragraph 219 was "invasive" of paragraph 218(a) this would overrule the *Central Scientific Co.,* case, *supra,* for there seems to be no reason to distinguish for invasion purposes between a finished scientific article and an unfinished one. The dictum plaintiff quotes from *United States* v. *Semon Bache & Co.,*

21 CCPA 218, 221, T.D. 46750, is that paragraph 219 providing for "sheet glass * * * for whatever purpose used," is "very comprehensive and extends to all such glass, so long as it remains sheet glass, or material only." This appears to exclude finished and unfinished forms of manufactured articles and thus to avoid any invasion of paragraph 218(a) by paragraph 219. It is not apparent how this quotation helps plaintiff. Besides the above cases, plaintiff cites *Semon Bache & Co.* v. *United States*, 67 Treas. Dec. 91, T.D. 47480 (not the same as the *Bache* case previously cited). This involved bent glass, circular pieces concave and convex, cut from a blown glass ball. The glass had various uses and the chief ones were other than for scientific or laboratory purposes. There is nothing here pertinent in the facts or in the reasoning of the court.

All the cases plaintiff relies on in its brief are mentioned above. Thus we fail to find in the brief any reason to think that the merchandise here involved is enumerated under paragraph 219 because of the presence therein of the words "for whatever purpose used" which we do not construe as an unambiguous command that the paragraph shall "invade" another provision for finished and unfinished glass scientific articles. It does not direct the classifying authority to ignore the degree of advancement of the article to be classified and thus, anomalously, to put an unfinished manufactured article in a paragraph characterized as dealing with a "material."

Thus we hold that the imported articles are unfinished scientific articles. The only effect of the operations, remaining to be performed after importation is to place them, as imported, in the "unfinished" category.

The protest is overruled and judgment will be rendered for the defendant.